UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
RORY SMITH,

                         Petitioner,             **MEMORANDUM AND ORDER**
                                              17-CV-557 (RRM)

         -against-

WILLIAM KEYSER, JR., *Superintendent,*
*Sullivan Correctional Facility*,

                         Respondent.
-------------------------------------------------------------x
ROSLYNN R. MAUSKOPF, Chief United States District Judge.

      Rory Smith, proceeding *pro se*, petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, asserting that his February 7, 2012, conviction for attempted murder in the second degree and assault in the third degree was unconstitutional.  For the reasons set forth below, Smith's petition for a writ of habeas corpus is denied and this action is dismissed.

## BACKGROUND

      On July 27, 2010, Smith punched George McDuffie in the face, breaking the bones around his eye.  (Resp't Resp. to Order Show Cause ("Resp't Resp.") (Doc. No. 9) at 1–2.)[1]  On August 10, 2010, Smith shot at McDuffie eleven times, hitting McDuffie in his hand, arm, and leg.  (*Id.* at 2.)  McDuffie escaped on his motorcycle and called 911.  (*Id.*)  Smith was subsequently charged with attempted murder in the second degree, N.Y. PENAL LAW §§ 110.00, 125.25(1), assault in the first degree, § 120.10(1), attempted assault in the first degree, §§ 110.00, 120.10(1), and two counts each of assault in the second degree, § 120.05(2), assault in third degree, § 120.10, criminal possession of a weapon in the second degree, § 265.03(3), (3)(1)(b), and criminal possession of a weapon in the fourth degree, § 265.01(1), (2).

---

[1] Unless otherwise noted, all page numbers correspond to ECF pagination.

### A.  Pretrial Hearing

On January 30, 2012, the trial court held a pretrial evidentiary hearing.  (Trial Tr. Ex. 3 to Resp't Resp. ("Ex. 3") (Doc. No. 9-3) at 44–66.)  At the hearing, the People sought to have the court admit into evidence two phone calls made by Smith while detained on Rikers Island to be used in its case-in-chief; the prosecution additionally stated that it possessed other phone calls made by Smith while at Rikers Island (collectively the "Rikers calls"), which it intended to use to impeach the defendant should the opportunity present itself.  (Ex. 3 at 47.)  One of these impeachment calls involved an uncharged crime and therefore required the prosecution to seek a *Sandoval* ruling.[2]

The first call the People sought to introduce (the "Ratchet Call"), took place on December 2, 2010.  In that call, Smith said that he was "thankful [to be] alive still" because he could have been on the "other side of the ratchet."  (Ex. 3 at 49.)  The "ratchet," the People argued, is "common vernacular for gun in Bedford Stuyvesant," which it claimed it could prove through the testimony of a detective.  (*Id.*)  The prosecution argued that this call was an admission of guilt because "[what] he is talking about is the event that got him into jail."  (Ex. 3 at 49–50.)  The defense argued that "any indicia of guilt by Mr. Smith … [was] speculative at best."  The court agreed and excluded the Ratchet Call.  (Ex. 3 at 51.)

The second call (the "Statement Call") occurred on September 14, 2010.  In that call, Smith asked Tamika Daniels, Smith's domestic partner, to instruct Darlene Powell, an eyewitness, to "take a couple of dollars and make [George McDuffie] sign a statement, and say it wasn't me."  (Ex. 3 at 52.)  The People argued that this was an admission of guilt; however, the

---

[2] A *Sandoval* ruling is a New York trial court's determination as to whether the government will be permitted to inquire into a criminal defendant's prior conviction(s) in the event that the defendant testifies at trial.  *See People v. Sandoval,* 34 N.Y.2d 371, 357 N.Y.S.2d 849, 314 N.E.2d 413 (N.Y. 1974); *see also Harris v. Kuhlmann,* 346 F.3d 330, 337 (2d Cir. 2003) (describing the nature of a *"Sandoval"* ruling).

defense argued that the statement was not an admission of guilt because, on the call, Smith also stated that "me and him had a fist fight, but now he is realizing it wasn't me because I didn't shoot him.… [McDuffie] is only saying that because he don't like me." (*Id.*)  The court admitted this call, finding that it was probative and an admission in two regards.  (Ex. 3 at 56.) First, Smith was instructing the individual on the phone to contact Powell, whom Smith was prohibited from contacting both directly and indirectly by an outstanding order of protection. (*Id.* at 52–53.)  Second, Smith was attempting to instruct a witness to change his testimony.  (*Id.* at 53.)

The defense requested that, if the Statement Call be admitted, a separate Rikers call, placed on September 13, 2010, be admitted as well under the "doctrine of completeness." (*Id.* at 55.)  In the September 13 call, Smith stated "I didn't shoot nobody." (*Id.*)  The defense argued that this call showed "clear indication from Mr. Smith that he was not involved in the shooting" and that taking the Statement Call out of context "is clearly prejudicial." (*Id.*)  The court found that there was no nexus between the two statements, that the September 13 statement was self-serving, and denied the defense's application to admit the September 13 call.  (*Id.*)

The trial court then conducted a *Sandoval* hearing to determine the admissibility of Smith's prior convictions and other uncharged crimes as impeachment material should the defendant testify.  (Ex. 3 at 57–66.)  Turning to Smith's prior convictions, the prosecution sought permission to cross-examine Smith on the following prior crimes: a 2006 false impersonation conviction and a 1992 conviction for criminal possession of a controlled substance in the fourth degree.  (*Id.* at 57–60.)  Defense counsel argued that the 1992 conviction was remote and prejudicial, and the 2006 conviction was likewise prejudicial.  (*Id.* at 62–64.)  The trial court

ruled that the 1992 drug conviction was too remote but allowed the prosecution to question

Smith on his conviction for false impersonation.  (*Id*. at 64–65.)

Additionally, the prosecution sought to have the court admit into evidence a September 7,

2010, Rikers call (the "Forgery Call") should the defendant testify.  (*Id*. at 60–63.)  In this call,

Smith told his aunt that he had a "legitimate way to get money right now.  The check is not fully

in my name. So, but it's in a male's name.  I have the I.D. and all of that.  I can't sign nothing

over."  (*Id*. at 61.)  The trial court found these statements too speculative and prohibited the

prosecution from inquiring about the Forgery Call.  (*Id*. at 65–66.)

### B.  Voir Dire

The prosecution used nine peremptory challenges and the defense used two of their

fifteen available challenges.  (Ex. 3 at 188, 194, 198.)  Although two individuals indicated some

concern with the use of a gun in the case, defense counsel did not move to strike them.  For

example, the defense did not strike Ms. Brown, who stated that "guns really scare[] me" and

whose cousin had died in a shootout the year before, but who maintained that she would "try

[her] best in this case" and would be fair.  (Ex. 3 at 133.)  Similarly, the defense did not strike

Mr. Chiu, who stated that he did not "like the people [who] carry guns except the police" but

who maintained that he would "try [his] best" to be fair.  (Ex. 3 at 135–36.)

### C.  The People's Case

Although twelve witnesses testified for the prosecution at trial, only two of them –

Powell and McDuffie – were eyewitnesses to the assault and the shooting.  The first witness,

Powell, the mother of McDuffie's daughter and a tenant at 656 MacDonough Street where both

events happened, was compelled to testify by a material witness order.  (Trial Tr. Ex. 4 to Resp't

Resp. ("Ex. 4") (Doc. No. 9-4) at 11–13.)  As to the assault that occurred on July 27, Powell

testified that she was arguing with her first-floor neighbor, Tamika Daniels, Smith's girlfriend, when McDuffie appeared with their daughter and also began arguing with Daniels.  (*Id*. at 52–54.)  Eventually, as the argument grew more heated, Smith came out of the apartment and joined the argument.  (*Id*. at 54.)

As they moved from the building stoop to the street, Powell testified that Smith walked away only to return to hit McDuffie in the eye from behind.  As McDuffie struggled to walk up the steps back into the apartment building, Smith "came up the steps and started hitting him again."  (*Id*. at 57–58.)   Powell testified that the building superintendent, Marlon Prescott, who also witnessed the fight, called the police.  On cross-examination, Powell testified that it was McDuffie who called Smith out to fight on August 27, but that Smith punched McDuffie from behind and McDuffie did not return the punch because he could not see. (*Id*. at 91, 97–99.)

As to the shooting on August 10, Powell testified that she woke up because she heard gunshots.  From her apartment windows, Powell observed Smith "shooting at [McDuffie]" while McDuffie was on his motorcycle.  (*Id*. at 60–61.)  She further testified that "[a]s George was riding past, [Smith] was shooting.  (*Id*. at 62.)  He was going down the steps, like, to keep shooting as he was going.  Then he ran back in the building" and ran back out and left in his van. (*Id.*)  Powell testified that she called police.  (*Id.*)  She later identified Smith at a lineup at the police precinct.  (*Id*. at 71.)  On cross-examination, Powell testified that she could see Smith shooting from the doorway of the building from two windows in her apartment even though one window had an air conditioner and the other window had window guards.  (*Id*. at 105–06.)

The prosecution called several police officers to testify as to the two events.  Officer Seymour testified that she responded to "an assault in progress" on July 27, 2010, and "took a complaint report."  (Trial Tr., Ex. 6 to Resp't Resp. ("Ex. 6") (Doc. No. 9-6) at 112, 115.)  At the

scene, Officer Seymour spoke to the super, McDuffie, and two adult females.  (Ex. 6 at 113.)

However, the prosecution was not able to produce the police report or any documentation for the

July 27, 2010, incident, indicating that it was lost.  (Trial Tr., Ex. 5 to Resp't Resp. ("Ex. 5")

(Doc. No. 9-5) at 103.)

Officer Wing testified that he arrived on the scene on August 10, 2010, found spent shell

casings at 656 MacDonough Street, and spoke to Powell and Daniels.  (Ex. 6 at 12–14, 18.)  On

cross-examination, Wing testified that he did not speak to Powell in person, but over the phone,

and that she said she heard yelling, not gunshots.  (*Id*. at 22–24.)

Officer Riviezzo, who was part of the evidence collection team dispatched to the scene

on August 10, testified that he collected eleven 9-millimeter shell casings and a portion of a

bullet from the front of, or near the vicinity of, 654 MacDonough Street.  (Ex. 4 at 129–30.)  On

cross-examination, Riviezzo testified that he did not look for bullet impact marks or look for the

remaining bullets.  (*Id*. at 141.)

The prosecution then called Sergeant Blackmon who testified that he responded to

several calls related to the shooting, including McDuffie's call.  (*Id*. at 148–49.)  Blackmon

testified that he observed McDuffie with "his hands bleeding" from "what appeared to be a

gunshot wound to his hands" and that McDuffie's motorcycle windshield and gas tank side was

damaged.  (*Id*. at 150, 160.)  Blackmon also testified that "11 shell casings" were found in front

of 656 MacDonough Street.  (*Id*. at 151.)  On cross-examination, Blackmon testified that he

could not recall if the damage to the motorcycle "came as a result of any gun fire."  (*Id*. at 170.)

Blackmon also testified that although McDuffie did not identify the person who shot him, he

provided a description and an address for the shooter.  (*Id*. at 153, 166, 170–72.)

Officer Kwok testified that he rode McDuffie's motorcycle to the precinct and observed "a couple of bullet holes in it" and a flat tire. (Ex. 6 at 98.) Detective McDonald testified that he spoke to McDuffie at Kings County Hospital and that McDuffie identified the shooter as Rory Smith. (*Id*. at 28–29.) He further testified that they conducted surveillance and spoke to Daniels in order to find Smith and that Smith was apprehended on August 30, 2010. (*Id*. at 31–39.)

Detective McDonald also testified that he conducted a lineup and that McDuffie, Powell and Prescott all identified Smith and that Smith was arrested. (*Id*. at 40–46.) On cross-examination, McDonald testified that Smith admitted to having a fight with McDuffie but denied shooting him. (*Id*. at 62.)

Detective Heaney, an expert in ballistics, testified that the shell casings came from the same gun because they "all had the same type of markings" and determined that the shell casings came from a semi-automatic 9-millimeter Luger pistol. (*Id*. at 78, 81.) On cross-examination, Detective Heaney testified that he made a mistake in indicating that there were twelve casings when there were only eleven. (*Id*. at 91–93.)

The prosecution also called Regina Ward, a tech tape 911 operator, to authenticate the 911 calls regarding the shooting on August 10. (Ex. 5 at 6–16.) Ward testified that the caller who made the first 911 call hung up. (*Id*. at 21.) Amy Lowe, an investigator with the New York City Department of Corrections, was called to authenticate the calls made while Smith was detained on Rikers Island and explained that all inmate calls are recorded. (Ex. 6 at 141–44.) Lowe further testified that inmates are notified that the phone calls are recorded through posters around the phones, in the inmate handbook, and on the recording on the receiver. (*Id*. at 144.) Ciara Pack, employed by T-Mobile, testified that she provided information pursuant to a subpoena for a prepaid account created on August 10, 2010. (*Id*. at 134–36.) On cross-

examination, Pack testified that once a prepaid phone is purchased it can be passed on to another person and there is no way for T-Mobile to know who is using the phone.  (*Id*. at 137–38.)

The prosecution then called George McDuffie, the victim of the assault and the shooting. He testified that he only knew Smith from seeing him at 656 MacDonough Street where his daughter lived with her mother and did not know his name.  (Ex. 5 at 43.)  McDuffie testified that on July 27, he was at 656 MacDonough Street to take his daughter to the dentist and became involved in an argument that Powell was having with the first-floor neighbor, Daniels.  (*Id*. at 45–49.)

McDuffie testified that Powell did not want Daniels cursing at their daughter for looking into her first-floor window.  (*Id*.)  Eventually Daniels's husband, Smith, came out of their apartment and started arguing with McDuffie too.  (*Id*. at 50–51.)  McDuffie testified that they went down the stairs in front of the building and continued arguing but that Smith then "walked off, walked down the block."  (*Id*. at 54.)  As he was talking to the super, McDuffie testified that Smith "came behind me and punched me" in the eye two times.  (*Id*. at 56.)  McDuffie further testified that he could not see and that Smith continued to punch him from behind before leaving again.  (*Id*. at 57–58.)  McDuffie testified that he spoke to the police, but declined an ambulance. (*Id*. at 59.)  Later, his face "started to swell up" and he could not open his jaw and he went to the hospital where he was diagnosed with an eye fracture that would require surgery.  (*Id*. at 61, 64–66.)

McDuffie also testified that he was outside of Powell's apartment building on the morning of August 10 after his work shift finished, when Smith arrived in his van, looked at him, and entered the building.  McDuffie testified that Smith "came right back out," went straight to him, and accused him of taking his son's bike.  (*Id*. at 59–61.)  According to McDuffie, Smith

8

also said that he hated him and that McDuffie would "bleed soon."  Smith then walked back to the building only to emerge shooting at him from the top of the stairs.  (*Id*. at 72–74.)  McDuffie testified that bullets grazed his hand, arm and leg and also hit his motorcycle.  (*Id*. at 75.)  McDuffie was able to start his motorcycle with some difficulty because the tire was flat and leave the scene, with Smith still shooting at him.  (*Id*. at 75–76.)  McDuffie parked his motorcycle a few blocks away, walked to a laundromat, and called police.  (*Id*. at 76–79.)  McDuffie also testified that he had initially called the police when Smith first approached, but hung up because Smith had walked away.  (*Id*. at 80–81, 150.)

McDuffie testified that he told police the shooter was the "guy from the building" but he did not know his name.  (*Id*. at 83.)  He also identified Smith from a lineup at the precinct.  (*Id*. at 85.)  On cross-examination, McDuffie testified that he could see who was standing on the stairs from Powell's windows, but not if the person was standing "all the way back."  (*Id*. at 118–19.)  McDuffie also disputed that he instigated the fight with Smith on July 27, testifying that Smith "walked down the stairs first" and called him out to fight.  (*Id*. at 137–38.)  McDuffie reiterated that Smith punched him from behind, that he turned toward the steps but could not see, and that Smith continued to punch him on his back and head while on the steps.  (*Id*. at 140–41.)

The prosecution's final witness, Adeola Koiki, the emergency medical technician who tended to McDuffie's wounds on August 10, testified that McDuffie was "bleeding from his wrist, his left arm and his right leg," and that he concluded that McDuffie had been shot.  (Trial Tr., Ex. 7 to Resp't Resp. ("Ex. 7") (Doc. No. 9-7) at 11–12, 18.)

### D.  The Defense Case

Defense counsel attempted to call Kevin Hinkson, who would have contradicted Powell's earlier testimony that she could see Smith shooting from the doorway of the building because it

was not visible from her window. (Ex. 7 at 26–28.) The trial judge did not allow Hinkson to testify, finding that it "would be an improper attempt to have a layperson testify as to an opinion." (*Id*. at 31.) Defense counsel objected and argued that his client was being deprived of his right to present a defense. (*Id*. at 32–33.)

Defense counsel called Chorn Grandison, a neighbor, who testified that he knew McDuffie, Smith, Powell, and Daniels and that he witnessed the argument and fight on July 27. (*Id*. at 34–39.) Grandison testified that McDuffie was "screaming at Tamika" and that McDuffie instigated the fight with Smith. (*Id*. at 41.) On cross-examination, Grandison testified that McDuffie never hit Smith and that Smith only threw one punch at McDuffie. (*Id*. at 48–49.)

Defense counsel then called Smith who testified that on July 27, he heard McDuffie "yelling at Tamika" and he came out of the apartment and that McDuffie invited him to fight. (*Id*. at 61–63.) Observing that McDuffie was bigger than he, Smith swung at him as soon as they reached the bottom of the steps. (*Id*. at 63.) Smith also testified that he could not recall where he was on August 10, but that he did not shoot at McDuffie or "anyone at any time." (*Id*. at 66–67.) Smith also testified that he worked odd maintenance jobs and produced a song, that he was convicted of false impersonation when he "told a police officer a wrong name because [his] license was suspended," and denied that he tried to bribe McDuffie or Powell. (*Id*. at 56.) On cross-examination, however, Smith testified that on July 27, he didn't throw the first punch because McDuffie "started swinging and I beat him to it" and that Smith was "facing him directly" when he hit McDuffie in the face. (*Id*. at 108–09.)

The prosecution then questioned Smith regarding nine Rikers calls, which included the three calls – the Forgery Call, the Statement Call, and the Ratchet Call – ruled upon in the pretrial/*Sandoval* hearing. (Ex. 7 at 113–16, 127–35.) The prosecution inquired about a call

placed September 6, 2010, (hereafter, the "Charges Call"), where Smith told Daniels that McDuffie "pressed charges … for the fight, but the police be pressing charges for the other stuff." (Ex. 7 at 112–14.)  This call was introduced in response to Smith's testimony that McDuffie refused to press charges for the assault.  (*Id.*)  Defense counsel did not contemporaneously object to the prosecution's use of this call.

The prosecution also inquired about calls placed on September 6, 2010, (the "Driving Call"); September 11, 2010, (the "First Clothes Call"), and September 14, 2010, (the "Second Clothes Call").  (Ex. 7 at 114–15, 121–22, 127–30.)  In the Driving Call, Daniels told Smith that he was "caught up driving [Tamika's] car" and Smith claimed: "what happened is the only way I'm back in contact with her."  (*Id*. at 121–22.)  In both the First and Second Clothes calls, Smith and Daniels discussed arrangements to have Daniels pick up clothes from a woman named Tisha's residence and deliver them to either his grandmother's residence or Daniel's residence.  (*Id*. at 114–15, 127–30.)  Defense counsel did not contemporaneously object to any of these calls being used by the prosecution.

Additionally, the prosecution inquired about two separate calls, both placed on September 15, 2010.  In the first call (the "Fifth Amendment Call"), between Smith and Daniels, Smith stated that he hadn't testified to the grand jury though he had wanted to, stating "I was pleading the fifth on the shooting in the first place." (Ex. 7 at 130–33.)  Smith claimed that he did not recall saying that he was intending to plead the fifth, and that he fired his previous attorney for waiving his right to testify before the grand jury without his consent.  (*Id.*)  Defense counsel did not contemporaneously object to the prosecution's use of this call.

On the second call (the "Income Call"), between Smith and Daniels, Smith told Daniels that women would pay him "thirty or forty to drop them there and pick them up." (*Id*. at 78–82.)

This call was introduced in response to Smith's testimony that his only source of income was through music production and "odd jobs," which included minor sheet rocking, flooring, and garbage handling.  (*Id*. at 75–82.)  Defense counsel contemporaneously objected to the prosecution's use of this call; however, the court overruled the objection, reprimanded defense counsel *in camera* for making frivolous objections, and noted that the prosecution's use of the call was proper because it adversely affected Smith credibility by showing that he was "either … acting as a pimp or lying to the woman he's living with about his activities."  (*Id* at 81, 92.)

On re-direct, Smith explained that on one of the calls he attempted to set up an alibi with Tamika Clark, a friend, because he spent a lot of time at her home and she may have known where he was on August 10.  He also explained that he did not pay McDuffie or Powell to change their testimony and only mentioned it to Daniels "out of desperation."  (*Id*. at 142–42.)

### E.  The Verdict and Sentence

Justice Del Giudice submitted to the jury only three of the counts charged in the indictment – assault in the third degree, attempted murder in the second degree, and attempted assault in the first degree – and he directed the jury to consider the attempted assault in the first degree only if it found defendant not guilty of the murder count.  On February 7, 2012, the jury found Smith guilty of assault in the third degree and attempted murder in the second degree. (Trial Tr., Ex. 8 to Resp't Resp. ("Ex. 8") (Doc. No. 9-8) at 143.)  On March 8, 2012, Justice Del Giudice adjudicated Smith a second felony offender and sentenced him to one year's imprisonment for the assault in the third degree and 23 years' imprisonment for the attempted murder in the second degree, plus five years post-release supervision.  (Ex. 8 at 156, 164–65.)

### F.  Direct Appeal

On appeal, Smith's appellate counsel raised four points on his behalf.  First, appellate counsel argued that Smith's due process rights were violated when the prosecutor improperly cross-examined Smith about phone calls that were ruled inadmissible by the trial court in the pretrial *Sandoval* hearing.  (Br. Def.-Appellant, Ex. 1 to Resp't Resp. (Doc. No. 9-1) at 40–62.) Second, appellate counsel raised ineffective assistance of counsel, faulting defense counsel's lack of preparation, his use of pejorative language to describe Smith, his failure to effectively challenge prospective jurors, and his failure to request effective limiting instructions after the Rikers calls were introduced.  (*Id.* at 56–73.)  Third, appellate counsel argued that the trial court deprived Smith of his right to present a defense when it did not allow an investigator to testify as to what could be seen from Powell's bedroom.  (*Id.* at 74–78.)  Fourth, appellate counsel argued that the 23-year sentence was excessive.  (*Id.* at 78–80.)

In their response, the People argued that the claim regarding the phone calls were unpreserved for appellate review, that Smith received effective assistance of counsel, and that his sentence was not excessive.  The People conceded that Smith should have been allowed to call the investigator as part of his defense, but claimed that this error was harmless.

In a Decision and Order issued on September 30, 2015, a divided panel of the Appellate Division affirmed Smith's judgment of conviction.  *People v. Smith*, 131 A.D.3d 1270 (N.Y. App. Div. 2015).  The majority found that Smith was not deprived of a fair trial because the evidence of Smith's guilt was overwhelming and any errors that were made during the trial were harmless.  *Id.* at 1273.  It further noted "that many of the alleged errors complained of by the defendant are not errors at all or are unpreserved for appellate review, as the defendant failed to object to them at trial when any error could have been corrected by the trial court."  *Id.*

Although defense counsel did not object to the alleged errors, the Appellate Division found that "such inaction did not deprive the defendant of the effective assistance of counsel." *Id.* at 1274–75 (citing *Strickland v Washington*, 466 US 668 (1984)). It also found that the sentence was not excessive. *Id.* at 1275.

The Honorable Sylvia O. Hinds-Radix dissented. Justice Hinds-Radix found that Smith was deprived of a fair trial when the court refused to allow Smith's investigator to testify and when it altered "the *Sandoval* ruling to permit cross-examination of the defendant about alleged misconduct which was not authorized by the *Sandoval* ruling and/or explicitly precluded by the *Sandoval* ruling after the defendant had already taken the stand." *Id.* at 1279. The dissent also found that questioning Smith "about a telephone conversation that he had with his girlfriend wherein he stated he wanted to testify before the grand jury but had not," "was highly prejudicial and in violation of the defendant's constitutional right against the use of his post arrest silence to impeach his credibility" as were certain comments made by the prosecutor during summation. *Id.* at 1280. Leave to appeal to the New York Court of Appeals, raising all of the same grounds raised in his brief, was denied on March 2, 2016. *People v. Smith*, 27 N.Y.3d 969 (2016).

**G. The Instant Petition**

On January 24, 2017, Smith commenced this timely action by placing his petition for a writ of habeas corpus in his prison mailbox. Smith raises the same grounds raised by appellate counsel on his direct appeal. (Pet. (Doc. No. 1).) Smith additionally argues that the prosecution improperly used his right to remain silent against him at trial by discussing the Fifth Amendment Call, and the court improperly excluded him from sidebar discussions where the pretrial/*Sandoval* rulings regarding the Rikers calls were modified. (Pet. at 8.) This Court

14

granted Smith's application to proceed *in forma pauperis* and ordered Respondent to show cause

as to why a writ of *habeas corpus* should not issue.  (Order to Show Cause (Doc. No. 7).)

Respondent filed a response that the writ should not be granted because Smith's claim

concerning the phone calls was procedurally barred, the state court's decision was not contrary to

or an unreasonable application of federal law, Smith received effective assistance of counsel, and

the length of Smith's sentence did not present a federal claim.  (Resp't Resp.)

In his reply (Pet'r Reply. Br. (Doc. No. 11)), Smith reiterates the arguments made on his

direct appeal and argues that he was denied a fair opportunity to make an informed decision to

take the stand because the prosecution did not seek an advanced ruling regarding, nor disclose

the substance of, the six Rikers calls not discussed in the pretrial hearing.  (*Id.* at 10.)  Smith

further argues that the prosecution's use of the Rikers calls improperly prejudiced him by

attacking his character.  (*Id.* at 14–15.)

## STANDARD OF REVIEW

A federal court may review a petition for a writ of habeas corpus only to the extent that

the petitioner has "exhausted the remedies available in the courts of the State."  28 U.S.C. §

2254(b)(1)(A); *see also Caballero v. Keane*, 42 F.3d 738, 740 (2d Cir. 1994).  This means that

each legal and factual allegation underlying a claim must first have been fairly presented to a

state court.  *Rodriguez v. Hoke*, 928 F.2d 534, 538 (2d Cir. 1991).  A petitioner may obtain

federal habeas review of a procedurally defaulted claim only where petitioner demonstrates

either "cause for the default and prejudice," or that "failure to consider the claims will result in a

miscarriage of justice (*i.e.*, the petitioner is actually innocent)."  *Aparicio v. Artuz*, 269 F.3d 78,

90 (2d Cir. 2001) (citing *Coleman*, 501 U.S. at 748–50).

Under 28 U.S.C. § 2254(d), "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254. "'Clearly established Federal law' means 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). A decision is "contrary to" clearly established Federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. A decision is an "unreasonable application" of clearly established Federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.*

Not all federal constitutional errors require automatic reversal. *Chapman v. California*, 386 U.S. 18, 22 (1967). The Supreme Court has divided constitutional errors into two classes: trial errors and structural errors. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006). Trial errors are those which occur "during the presentation of the case to the jury," and may "be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Arizona v. Fulminante*, 499 U.S. 279,

307–08 (1991).  Structural errors are "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards." *Id.* at 309.

"[A]n error is harmless unless it 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Fry v. Pliler*, 551 U.S. 112, 116 (2007) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993)).  "[W]hen a state court determines that a constitutional violation is harmless, a federal court may not award habeas relief under § 2254 unless the harmlessness determination itself was unreasonable." *Fry*, 551 U.S. at 119 (citing *Mitchell v. Esparza*, 540 U.S. 12 (2003)).  "And a state-court decision is not unreasonable if 'fairminded jurists could disagree on its correctness.'" *Spencer v. Capra*, 788 F. App'x 21, 23 (2d Cir. 2019) (quoting *Davis*, 576 U.S. at 269).

In addition, federal courts have no authority to review state court decisions that rest upon "independent and adequate" state law grounds.  *Lee v. Kemna,* 534 U.S. 362, 375 (2002); *see also Green*, 414 F.3d at 294 ("A federal habeas court lacks jurisdiction to evaluate questions of federal law decided by a state court where the state court judgment 'rests on a state law ground that is independent of the federal question and adequate to support the judgment.'") (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).  Generally, a state law ground will be considered adequate to preclude habeas review if it is "firmly established and regularly followed by the state in question." *Whitley v. Ercole*, 642 F.3d 278, 286 (2d Cir. 2011) (quoting *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999)).  Federal habeas review is foreclosed when the state court expressly relied on the petitioner's procedural default at trial as an independent and adequate state law ground.  *Green*, 414 F.3d at 294; *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990).

**DISCUSSION**

**A.   Denial of Right to Present Defense**

Smith alleges that the trial court deprived him of his right to present a defense when it failed to allow his investigator to testify.  (Pet. at 5.)  Specifically, Smith alleges that the investigator would have testified that it was impossible to see the doorway or the steps from the third-floor window, which contradicted the testimony of the prosecution's eyewitness, Darlene Powell.  (*Id.*)  Smith argues that the trial court's ruling deprived him of his right to present a defense in violation of the Sixth and Fourteenth Amendments of the United States Constitution.  (*Id.*)  This claim was fairly presented to the state court in Smith's direct appeal and in Smith's request for leave to appeal to the New York Court of Appeals.

The People conceded and the Appellate Division agreed that "the Supreme Court should not have denied [Smith's] request to introduce evidence from a private investigator" but that "the error was harmless." *Smith,* 131 A.D.3d at 1273.  The Appellate Division found that the investigator's testimony would have refuted only a portion of Powell's testimony and because Powell was cross-examined by defense counsel "that issue was before the jury for consideration."  *Smith,* 131 A.D.3d at 1273.  The claim was thus adjudicated on the merits, and Smith is entitled to habeas relief only if he can demonstrate that the state court adjudication "resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding," or "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]"  28 U.S.C. § 2254(d)(1), (2).

A trial court's erroneous exclusion of a defense witness is a trial error subject to harmless error review.  *Jones v. Stinson*, 229 F.3d 112, 120 (2d Cir. 2000) (finding that the exclusion of

testimony is a trial error "subject to lenient harmless error review."). Here, the exclusion of the investigator's testimony did not have a substantial and injurious effect or influence in determining the jury's verdict against Smith. Even if defense counsel had been successful in impeaching part of Powell's testimony with the investigator's testimony, McDuffie's testimony and the ballistic evidence would have remained unimpeached. *See, e.g., Zimmerman*, 492 F.Supp.2d at 193–94 (finding the exclusion of two witnesses harmless because their limited testimony would not have altered the jury's verdict). Smith's guilt was established through the testimony of the victim, George McDuffie, and eyewitness Darlene Powell, both of whom knew Smith. McDuffie identified Smith as the person who shot him and Powell testified that she could see Smith firing a gun at McDuffie from her third-floor window. (Ex. 4 at 61–62; Ex. 5 at 73–74.) Smith's investigator would have testified that neither the doorway nor the stoop was visible from Powell's windows. (Ex. 6 at 61–62; Ex. 7 at 26–27.) However, Powell also testified that Smith continued to fire while he "was going down the steps" and that Smith "walked down some of the front steps toward the gate." (Ex. 4 at 62, 69.) McDuffie and Powell's testimony was corroborated by "the shell casings the police found that led from the doorway to the street." *Smith,* 131 A.D.3d at 1272. Although Powell may not have had a clear view of the entire shooting, there was no dispute as to whether she could see the street from the window and therefore could see Smith as he continued to shoot at McDuffie. Powell also testified that she saw Smith run into the building, run back out, and leave the scene in a van. (Ex. 4 at 62, 113.) The only part of Powell's testimony that the investigator would have refuted was whether Powell could see Smith shooting from the doorway or the stoop, an area of questioning which was covered by Smith's defense counsel on cross-examination. (Ex. 4 at 104–06, 122–23.)

Moreover, unlike Powell, McDuffie had a clear view of Smith and he identified Smith as the shooter.  (Ex. 5 at 73–74.)

Even if the Court found that the trial court wrongfully precluded the investigator's testimony and committed constitutional error, the Court agrees with the Appellate Division's holding that the error was harmless.  Accordingly, Smith's claim that he was deprived of his constitutional right to present a defense fails on the merits.

### B.  Denial of Right to Due Process and a Fair Trial

Smith alleges that he was denied due process and a fair trial in violation of the Fifth, Sixth, and Fourteenth Amendments.  (Pet. at 7–8.)  Specifically, Smith alleges that the trial court erroneously permitted the prosecutor to attack his credibility and character by questioning him regarding the nine Rikers calls and failed to issue a limiting instruction to counteract this error. (*Id.* at 7–8.)  Smith argues that the prosecution's use of the Fifth Amendment Call violated his right to remain silent and encouraged the jury to draw impermissible inferences.  (Br. Def.-Appellant at 7; Criminal Leave Appl. at 8; Pet. at 7.)  Additionally, Smith argues that he was deprived of due process by being excluded from the sidebar discussions where the court altered its initial pretrial/*Sandoval* rulings.  (Pet. at 7; Pet'r Reply Br. at 10.)

### i.  Procedural Bar

The Appellate Division held that "many of the alleged errors complained of by the defendant are not errors at all or are unpreserved for appellate review, as the defendant failed to object to them at trial when any error could have been corrected by the trial court."  *Smith*, 131 A.D.3d at 1273.  The Second Circuit has held that generalized language that does not identify which claims are unpreserved does not effectuate a procedural bar.  *See Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 810 (2d Cir. 2000) ("[W]hen a state court uses language such as 'the

defendant's remaining contentions are either unpreserved for appellate review or without merit,' the validity of the claim is preserved and is subject to federal review."). Here, the Appellate Division did use generalized language, but it likewise provided specificity as to certain claims – *i.e.*, claims regarding errors that "the defendant failed to object to … at trial." *Smith*, 131 A.D.3d at 1273.

The New York State procedural rule regarding contemporaneous objections, N.Y. CRIM. PROC. LAW § 470.05(2), states that all parties must make a specific contemporaneous objection at trial in order to preserve an issue for appellate review. *See Gonzalez v. Cunningham*, 670 F. Supp. 2d 254, 261 (S.D.N.Y. 2009) (The "Second Circuit recognizes New York's contemporaneous objection rule as an independent and adequate state procedural rule barring habeas review."). This rule is an independent and adequate state law ground that, if violated, serves as a procedural bar to preclude habeas review. *Downs v. Lane*, 657 F.3d 97, 102 (2d Cir. 2011); *Whitley*, 642 F.3d at 286–87. Smith admits that his attorney failed to "object to the prosecutor's misuse of the calls" and "failed to request any limiting instructions." (Pet. at 8.) Therefore, Smith's claims regarding several of the Rikers calls were unpreserved for appellate review.

Smith's defense counsel did not contemporaneously object to the Fifth Amendment Call, the First Clothes Call, the Second Clothes Call, the Driving Call, or the Charges Call. However, out of these five unobjected calls – although petitioner has repeatedly contested the prosecution's use of all nine Rikers calls – only the Fifth Amendment Call has been argued as being prejudicial. (Br. Def-Appellant at 46.) The remaining four Rikers calls – the Alibi Call, the Forgery Call, the Ratchet Call, and the Income Call – were contemporaneously objected to at trial, raised on direct appeal, and therefore preserved.

The Appellate Division regarded errors that were unobjected to at trial as unpreserved. The Fifth Amendment Call was unobjected to and therefore was expressly regarded as unpreserved by the Appellate Division, which effectuates a procedural bar. *Thompson v. Griffin*, No. 14-CV-1641 (DLI), 2019 WL 1368995, at *4 (E.D.N.Y. Mar. 25, 2019) (quoting *Butler v. Cunningham*, 313 F. App'x 400, 401 (2d Cir. 2009) (summary order) ("When a state court concludes that a claim is unpreserved for appellate review, this is 'an independent and adequate state ground that bars a federal court from granting habeas relief.'")  Additionally, the argument that Smith was deprived of due process by being excluded from the sidebar discussions regarding the pretrial/*Sandoval* rulings was neither raised on direct appeal nor contemporaneously objected to and is likewise procedurally barred.

A petitioner can overcome this bar only if he can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman*, 501 U.S. at 750. To establish "cause" for the default, a habeas petitioner must show that "some objective factor external to the defense" impeded the petitioner's ability to present the claim. *Coleman*, 501 U.S. at 753.  Examples of such a scenario would be "that the factual or legal basis for a claim was not reasonably available to counsel … or that some interference by officials … made compliance impracticable." *Id.* (quoting *Murray v. Carrier*, 477 U.S. 478, 492 (1986)).  To establish "prejudice," a petitioner must show that "'there is a reasonable probability' that the result of the trial would have been different" absent the alleged constitutional violation. *Stickler v. Greene*, 527 U.S. 263, 289 (1999) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).

Here, Smith makes no argument of cause or prejudice sufficient to overcome this procedural bar.  Nevertheless, even if Smith's unpreserved claims could be reviewed by this Court on the merits, they would be denied.

### ii.     Harmless Error Review

Smith argues that the trial court erred when it allowed the prosecutor to use the Rikers calls, two of which had been excluded in the pretrial hearing, in cross-examining Smith, and erred when it failed to issue a limiting instruction to the jury to counteract this error.  The Appellate Division held that two calls, the Income Call and the Forgery Call, were properly admitted as impeachment material and relevant to credibility, respectively.  *Smith*, 131 A.D.3d at 1274.  The Appellate Division further held that "[o]ther phone calls made by the defendant from Rikers Island were properly admitted to show the defendant's consciousness of guilt," but failed to identify precisely which calls were included in this category.  *Id.*  The Appellate Division then provided a catch-all, holding: "To the extent that the court's admission of other phone calls made by the defendant was error, the error was harmless."  *Id.*  This harmlessness determination was not itself unreasonable; therefore, petitioner's habeas petition must be denied on these grounds.

Without deciding this issue, there may have been error involved in the prosecution's use of the Rikers calls.  The Ratchet Call "had been excluded prior to trial … and [arguably] nothing in [Smith's] direct testimony justified [the prosecution's] use of the call."  (Pet'r Reply Br. at 13.)  Additionally, the prosecution's use of the Fifth Amendment Call is concerning.  The Forgery Call, like the Ratchet Call, was explicitly excluded by the trial court during the pretrial hearing but nevertheless used by the prosecution during cross-examination.  (Ex. 3 at 65–66.)  Though Smith may be correct in asserting that the "prosecutor's use of most of the calls violated the ban on the use of extrinsic evidence to impeach on collateral matters," this Court is not weighing these errors' impact on the trial in the first instance, but rather whether the Appellate Division reasonably determined the errors were harmless.  The Appellate Division held that:

> The evidence as to the identity of the defendant as the perpetrator in both instances
> was overwhelming. The testimony of both the complainant and Powell, and their

23

respective familiarity with the defendant, established the identification of the defendant as the perpetrator beyond a reasonable doubt []. As to the assault, the defendant did not deny that the incident occurred; rather, his testimony that the complainant was the aggressor and that he was defending himself was rejected by the jury. Immediately after the shooting incident, both the complainant and Powell identified the defendant as the perpetrator to the police and identified him at trial as the individual who shot at and who had, on the earlier date, assaulted the complainant …. The complainant testified at the trial that the defendant assaulted him during the first incident and, thereafter, on August 10, he saw the defendant and spoke to him before the defendant told the complainant he hated him and intended to kill him. The complainant testified that, after he heard the gunshots, he realized he was bleeding, looked over his shoulder and saw the defendant firing a gun at him …. Powell also testified that the defendant was the person who, during the first incident, assaulted the complainant, and who shot at and wounded the complainant during the second incident. Powell was familiar with the defendant because she had spent time with both Daniels and the defendant in their apartment …. Powell's testimony that she could see the defendant shooting from the doorway was corroborated by the path of shell casings the police found that led from the doorway to the street …. The contention of our dissenting colleague that the evidence was not overwhelming ignores the physical evidence that corroborated the testimony of the witnesses.

*Smith*, 131 A.D.3d at 1272–73.

The majority did not individualize its harmlessness analysis to every call used by the prosecution, instead opting to blanketly categorize all the "other calls" as harmless. *Smith*, 131 A.D.3d at 1274. And undoubtedly, reasonable minds may differ on whether the remaining, non-erroneous evidence was "overwhelming" as the Appellate Division majority described it. However, it is precisely because "fairminded jurists could disagree on [the] correctness" of the harmlessness determination that proves the Appellate Division's determination was not itself unreasonable. *Spencer v. Capra*, 788 F. App'x 21, 23 (2d Cir. 2019). Thus, habeas relief must be denied on these claims.

Smith also makes two other arguments that likewise fail. First, Smith asserts that the prosecution's use of the Fifth Amendment call violated his right to remain silent. (Pet. at 7.) Second, he argues that the trial court's admission of the Rikers calls is compounded by the fact

that he was not permitted to attend the sidebar discussions where the court modified its pretrial/*Sandoval* rulings that initially excluded two of the Rikers calls.  (Pet. at 7; Pet'r Reply Br. at 10.)

Mentioning a defendant's post-*Miranda* silence at trial is subject to harmlessness review. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993) (holding that reference to post-*Miranda* silence is a constitutional trial error), *superseded by statute on other grounds*, Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104–132, 110 Stat. 1214 (1996), *as recognized in Gutierrez v. McGinnis*, 389 F.3d 300 (2d Cir. 2004).  Thus, since the Appellate Division, as discussed above, held that any errors were harmless – and this conclusion is not itself unreasonable – this claim fails on the merits as well.

Additionally, it is not a federal constitutional violation for a defendant to be absent from sidebar discussions addressing purely legal questions, such as the admissibility of evidence.  *See Wilson v. Bennett*, 188 F. Supp. 2d 347 (S.D.N.Y. 2001) (finding no Confrontation Clause violation where defendant was not present for sidebars addressing admissibility of evidence on cross-examination); *see also Persaud v. Mantello*, 99-CV-1861 (NG), 2002 U.S. Dist. LEXIS 12079, at *5 (E.D.N.Y. July 2, 2002) ("[T]here is no constitutional right to be present at sidebar conferences dealing only with legal questions.") (citing *United States v. Rubin*, 37 F.3d 49, 54 (2d Cir. 1994)).  Thus, habeas relief is likewise denied on this claim.

### C.  Ineffective Assistance of Counsel

Smith alleges that he was deprived of effective assistance of counsel in violation of the Sixth and Fourteenth Amendments.  (Pet. at 7, 9–11.)  Specifically, Smith alleges that his defense counsel: (i) failed to object to the Rikers calls or request a limiting instruction, (ii) failed to challenge two prospective jurors and only used two peremptory challenges, (iii) failed to

present a defense to the top charge of attempted murder in the second degree and instead focused on the lesser count of assault in the third degree, (iv) displayed a lack of understanding of the applicable law, (v) failed to review the victim's medical records so as to impeach the victim's testimony, and (vi) used inflammatory and derogatory language. (*Id.* at 7, 9–11.) The Appellate Division held that defense counsel's failure to object did not deprive Smith of the effective assistance of counsel and that "the record reveals that defense counsel otherwise provided meaningful representation." *Smith,* 131 A.D.3d at 1274 (citing *Strickland v. Washington*, 466 U.S. 668 (1984)).

"Because the state appellate division adjudicated the petitioner's ineffective assistance claim on the merits, … the issue for this court is whether the state court unreasonably applied the *Strickland* standard." *Davis v. Mantello*, 42 F. App'x 488, 491 (2d Cir. 2002) (citing *Lindstadt v. Keane*, 239 F.3d 191, 198 (2d Cir. 2001); *Loliscio v. Goord*, 263 F.3d 178, 193 (2d Cir. 2001)). In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-pronged test for deciding ineffective assistance claims. To satisfy the first prong, "the defendant must show that counsel's representation fell below an objective standard of reasonableness" and "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 688–89. To satisfy the second prong, a petitioner must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The Supreme Court defines "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Id.* As the Second Circuit has stated, "[t]he level of prejudice the defendant need demonstrate lies between prejudice that 'had some conceivable effect' and

prejudice that 'more likely than not altered the outcome in the case.'" *Linstadt*, 239 F.3d at 204 (quoting *Strickland*, 466 U.S. at 693).

Moreover, the Supreme Court has emphasized that when a petitioner brings a claim for ineffective assistance of counsel, "AEDPA review is doubly deferential, because counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Woods v. Etherton*, 136 S.Ct. 1149, 1151 (2016); *Burt v. Titlow*, 571 U.S. 12, 15 (2013) (explaining that the doubly deferential standard of review must give "both the state court and the defense attorney the benefit of the doubt").

In arguing that his attorney provided ineffective assistance of counsel, Smith alleges that his lawyer failed to object to the use of the Rikers calls to impeach him, failed to request a limiting instruction, failed to challenge two jurors during voir dire, and focused his defense on the lesser count of assault.  These claims can be attributed to defense counsel's trial strategy, which is entitled to the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Acevedo v. Capra,* 600 F. App'x 801, 802–03 (2d Cir. 2015).  "Actions or omissions by counsel that 'might be considered sound trial strategy' do not constitute ineffective assistance." *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000) (quoting *Strickland*, 466 U.S. at 689); *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) ("counsel must have 'wide latitude' in making tactical decisions") (citing *Strickland*, 466 U.S. at 489).

Smith has failed to overcome the "strong presumption" that his counsel's failure to object, failure to request a limiting instruction, or failure to challenge two jurors "derived … from trial strategy." *Acevedo,* 600 F. App'x at 802–03.  Indeed, "decisions such as when to object and on what grounds are primarily matters of trial strategy and tactics, and thus are virtually unchallengeable absent exceptional grounds for doing so." *Broxmeyer v. United*

*States,* 661 F. App'x 744, 748 (2d Cir. 2016) (quoting *United States v. Cohen*, 427 F.3d 164, 170 (2d Cir. 2005)).  Smith cannot prevail on this claim simply because he disagrees with the specific trial tactics his attorney used.  Smith's argument that his attorney focused on the assault charge rather than the attempted murder charge was also a trial strategy entitled to deference.  "When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect."  *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (citing *Strickland*, 466 U.S. at 690).

Smith's argument that his defense counsel "displayed a lack of understanding of law as it applied" is not supported by the record.  Smith's attorney referred to the incorrect standard only once during the trial and he apologized to the court for doing so.  (Ex. 7 at 147.)  Furthermore, the record reflects that defense counsel made sound objections and arguments at Smith's pretrial hearings and at trial.  Defense counsel obtained a favorable *Sandoval* ruling, (Ex. 3 at 62–79,) effectively cross-examined the People's witnesses, requested an adverse inference charge, (Ex. 6 at 153–55,) called an eyewitness who testified that Smith did not instigate the fight, (Ex. 7 at 34–43,) sought to put on an investigator to refute the testimony of an eyewitness, (Ex. 7 at 25–31,) and made both an opening statement and a summation that urged the jury to reject the testimony of the eyewitnesses and to find Smith not guilty.  (Ex. 4 at 41–42; Ex. 8 at 17–46.)  Furthermore, defense counsel repeatedly argued to have Smith's bail status reinstated.[3]  (Ex. 4 at 2–4; Ex. 6 at 2–3; Ex. 7 at 49–51.)  Defense counsel also argued at sentencing that Smith had not received a fair trial because he was not allowed to call a witness to challenge Powell's testimony and argued for a lesser sentence.  (Ex. 8 at 149–51, 159–62.)

---

[3] Smith was out on bail during the initial pretrial proceedings, but the trial judge revoked his bail when Smith showed up to court 15 minutes late after a lunch break.  (Ex. 3 at 206–08.)

Smith's argument that his attorney failed to review McDuffie's medical records in which McDuffie "stated he was not sure if the gun was a regular gun or a BB gun," and used derogatory language, such as "perp," "punk," "philanderer," and "pigeon" in reference to Smith, do not support his claim of ineffective assistance of counsel. *See Edwards v. Greiner*, No. 03-CV-6124 (NGG), 2006 WL 2355845, at *10 (E.D.N.Y. Aug. 15, 2006) ("Petitioner's claim that his counsel at sentencing was ineffective for making comments that undermined his purported plea for leniency and disparaged his client is without merit because his counsel's comments at sentencing, considered in their totality, were not professionally unreasonable."). Smith has failed to show how defense counsel's purported errors would have changed the outcome of the trial, especially given the testimony of two eyewitnesses and the ballistics evidence supporting his conviction. Defense counsel's conduct was not outside the wide range of professional competent assistance. Nor were counsel's errors, if any, "so serious that counsel was not functioning as 'counsel' guaranteed by the Sixth Amendment." *See Strickland*, 466 U.S. at 687. The Appellate Court found that Smith's defense counsel "provided meaningful representation," *Smith*, 131 A.D.3d at 1274, and the Court does not find that conclusion unreasonable. Accordingly, Smith fails to establish that he received ineffective assistance of counsel.

**D. Excessive Sentence**

Smith alleges that his sentence of 23 years' incarceration and five years of post-release supervision exceeds the 25-year statutory maximum for attempted murder in the second degree in violation of the Eighth and Fourteenth Amendments. (Pet. at 12.) The Appellate Division held that the sentence imposed was not excessive. *Smith,* 131 A.D.3d at 1275.

As an initial matter, this claim is unexhausted because any constitutional challenges to Smith's sentencing were not "fairly presented" to the state courts on direct appeal. Smith's

29

appellate brief presented a challenge to his sentence in terms of state law, specifically arguing that N.Y. CRIM. PROC. § 470.15(3)(c) permits the state court to modify the sentence "in the interest of justice" and he did not challenge his sentence at all in his leave application.  (Br. Def. Appellant; Criminal Leave Appl., Ex. 2 to Resp't Resp. (Doc. No. 9-2).)  It is well-established "that a petitioner's reliance on a state procedural law granting courts discretionary authority to reduce sentences does not fairly present a federal constitutional claim in state court." *Bell v. Ercole*, 631 F. Supp. 2d 406, 418 (S.D.N.Y. 2009) (collecting cases); *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) (per curiam) (holding that a claim is unexhausted where a petitioner alleges his prison sentence violated a federal constitutional right but failed to assert the claim first in state court).  Therefore, this claim is unexhausted.

Furthermore, even if addressed on its merits, Smith's claim of excessive punishment fails because his sentence fell within the range permitted under New York State law.  *See White*, 969 F.2d at 1383 ("No federal constitutional issue is presented where … the sentence is within the range prescribed by state law.")  Smith was convicted of attempted murder in the second degree – a class B violent felony, *see* N.Y. Penal Law § 70.02(a)(1) – and assault in the third degree – a class A misdemeanor, *see* N.Y. Penal Law § 120.00.  He was sentenced to concurrent determinate terms totaling 23 years' imprisonment and five years of post-release supervision. (Ex. 8 at 164–65.)  Smith was sentenced as a second felony offender pursuant to N.Y. Penal Law §70.06(6)(a), which provides in relevant part:

> When the court has found, pursuant to the provisions of the criminal procedure law, that a person is a second felony offender and the sentence to be imposed on such person is for a violent felony offense, as defined in subdivision one of section 70.02, the court must impose a determinate sentence of imprisonment the term of which must be fixed by the court as follows:
> > (a) For a class B violent felony offense, the term must be at least eight years and must not exceed twenty-five years ….

N.Y. Penal Law § 70.06(6).  Prior to April 1, 2019, the maximum term for a class A misdemeanor was one year.  *See* NY Penal Law § 70.15(1).

Smith's 23-year sentence with five years of post-release supervision fell within the range permitted by New York law.  *See Dorsey v. Irvin,* 56 F.3d 425, 427 (2d Cir. 1995); *Dotsenko v. Joseph,* No. 18-CV-1640 (WFK), 2019 WL 4917952, at *5-6 (E.D.N.Y. Oct. 4, 2019) (rejecting petitioner's Eighth Amendment excessive sentence claim because sentence fell within New York's sentencing guidelines); *Ocasio v. Brown*, No. 09-CV-6592T (MAT), 2011 WL 1988787, at *2 (W.D.N.Y.  May 23, 2011) (rejecting petitioner's claim that the imposition of a five-year period of post release supervision combined with his term of imprisonment exceeded the statutory maximum prison term in violation of his federal constitutional rights); *Frazier v. Marshall*, No. 08-CV-1737 (RRM), 2012 WL 3800828, at *8 (E.D.N.Y. Sept. 2, 2012) ("sentence was appropriately based on [petitioner's] classification as a second felony offender"); *Thigpen v. Brown,* No. 06-CV-3110 (NG) (VVP), 2008 WL 5110890, at *13 (E.D.N.Y. Dec. 2, 2008) ("When a sentence imposed is within the range prescribed by law, 'a claim of excessive punishment does not present a constitutional question necessary for habeas corpus reversal.'") (quoting *Underwood v. Kelly,* 692 F.Supp. 146, 152 (E.D.N.Y. 1988)).  Thus, Smith suffered no federal constitutional violation and his excessive sentence claim is denied.

## CONCLUSION

For the reasons set forth above, the instant petition for a writ of habeas corpus is denied and this action is dismissed.  A certificate of appealability shall not issue because Smith has not made a substantial showing of the denial of a constitutional right.  *See* 28 U.S.C. § 2253(c)(2). The Clerk of Court is directed to enter judgment in accordance with this Memorandum and

Order, mail a copy of the judgment and this Memorandum and Order to Smith, note the mailing

on the docket sheet, and close this case.

SO ORDERED.

Dated: Brooklyn, New York
      January 11, 2021

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
Chief United States District Judge